UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                               Case Number: 10-12245-13

DAVID B. HOLMDAHL and
TERESA M. HOLMDAHL,

            Debtors.

---

MEMORANDUM DECISION AND ORDER

      This case presents an unusual scenario in which the debtors actually hope to benefit from a failed foreclosure sale.  The parties have stipulated to the essential facts.  The Holmdahls' home is encumbered by a mortgage in favor of the creditor, AnchorBank.  The debtors defaulted on their loan payments and AnchorBank started foreclosure proceedings in October of 2007.  A foreclosure judgment was entered in March of 2008.  After the expiration of the debtors' redemption period, a sheriff's sale was conducted the following March.  The highest bidder at the foreclosure sale was U.S. Bank, N.A., which held a second mortgage on the Holmdahls' home.  U.S. Bank's winning bid was $272,500.00, and it paid a 10% down payment of $27,250.00 to the court clerk at the conclusion of the sale.

      Subsequently, U.S. Bank notified the state court that it no longer intended to pay the balance of the purchase price, and the sale was not confirmed.  As a result, the down payment was forfeited pursuant to Wis. Stat. § 846.17.  In August

of 2009, the state court entered an order which stated that the forfeited down payment would be forwarded to AnchorBank.  The order also provided that:

> $27,250.00 will be credited to the balance owed by the Defendants Holmdahl to S&C Bank (Anchor Bank) by virtue of the foreclosure of 07CV649, retroactive to June 10, 2009.  Said $27,250.00 will reduce the amount owed on Note No. 788136534 retroactive to June 10, 2009.

The debtors filed bankruptcy in March of 2010.  After the debtors filed bankruptcy, AnchorBank filed a proof of claim which reflected a total claim of $256,730.87, including arrearages of $50,861.70.  The claim also reflected that the bank was holding the forfeited funds and had not yet applied them to either the principal claim or the arrearages.

As a preliminary matter, it must be acknowledged that the foreclosure process had reached the penultimate moment, if not the final event:  the property was sold at a sheriff's sale.  There remained only the confirmation of the sale to fully and completely divest the debtors of any right or interest in the property. Instead, the prospective purchaser backed out of the transaction for unspecified reasons, leaving the property unsold at the time the debtors filed bankruptcy.  The debtors' plan contemplates that they will make monthly payments on the mortgage and that they will pay the pre-petition arrearage (all of the unpaid monthly payments which arose prior to the bankruptcy) after receiving a credit against that amount for the forfeited funds.  Basically, the debtors propose to "de-accelerate" the mortgage debt and reinstate the regular mortgage payments in accordance with the original loan terms.  Their effort in this regard is permissible, as a chapter 13 plan can de-accelerate and reinstate a mortgage after entry of a foreclosure

judgment. See In re Clark, 738 F.2d 869, 872 (7th Cir. 1984) ("De-acceleration, therefore, is not a form of modification banned by [§ 1322](b)(2) but rather is a permissible and necessary concomitant of the power to cure defaults.").[1]

Under 11 U.S.C. § 1322(c)(1), the debtors are entitled to cure their pre-petition defaults, which they have proposed to do. The bank's objection is to the debtors' proposed treatment of the forfeited funds as not merely reducing the bank's total claim, but the arrearages as well. There is no debate that the forfeited funds must be applied to the debt in some fashion; U.S. Bank's failure to close the sale does not result in an uncredited windfall to the creditor. The only bone of contention is whether the funds should also be used to reduce the amount of arrearages the debtors owe, thus reducing the amount they are required to cure. If the forfeited funds are not applied to the arrearages, the debtors will be required to maintain the current mortgage payments and pay the creditor an additional $50,000.00 during the life of the plan in order to cure the pre-petition defaults. By applying the forfeited funds to the arrearages, the debtors would only need to make their current payments and pay an additional $23,000.00.

---

[1] As the Seventh Circuit has recognized, Congress "intended that the states were to have the last word in setting the outer limits of the right to redeem" when considering the right to cure a residential mortgage default under § 1322(c)(1). Colon v. Option One Mortg. Corp., 319 F.3d 912, 919 (7th Cir. 2003). In Colon, the Seventh Circuit ruled that under Illinois law a debtor could not cure a residential mortgage default in a chapter 13 case which was filed after the foreclosure sale because the debtor's right to redeem was terminated by the sale. Id. Wisconsin law deviates from Illinois law on this point. In re Wescott, 309 B.R. 308 (Bankr. E.D. Wis. 2004). Under Wisconsin law, a mortgagor may generally redeem the property until a foreclosure sale is confirmed. GMAC Mortg. Corp. v. Gisvold, 215 Wis. 2d 459, 484 n.14, 572 N.W.2d 466 (Wis. 1998). Consequently, until the foreclosure sale is actually confirmed, debtors in Wisconsin may in most instances cure a residential mortgage default under a chapter 13 plan. Wescott, 309 B.R. at 312.

In either event, the debtors should theoretically be "current" on their mortgage when they emerge from chapter 13, having maintained their current payments and cured all prior defaults.[2]  Under the debtors' proposal, the bank should still have received the benefit of its contractual bargain.  They contend that the bank's interpretation would actually put the bank ahead of the game, as the bank will have received more from the combination of forfeited funds, current payments, and cured arrearages than the mortgage's original amortization schedule would have contemplated.  The bank, in contrast, argues that because the funds were received as part of the foreclosure sale process, it is entitled to treat the funds as a payment against principal.[3]  Under this interpretation, the bank would simply reduce the entire balance by the amount of the "extra" payment and nonetheless be entitled to demand that the full amount of the arrearages be cured within the plan period.

There are a variety of common-law principles associated with payment, although they are of minimal assistance in this case.  For example, where a debtor

---

[2] In recent years, there have been allegations that some mortgage lenders have misallocated plan payments or collected unauthorized and undisclosed fees while debtors were operating under a confirmed chapter 13 plan.  See, e.g., Cano v. GMAC Mortg. Corp. (In re Cano), 410 B.R. 506 (Bankr. S.D. Tex. 2009).  Such concerns are not presently an issue in this case.

[3] The bank notes that there were no payments due on the loan when the state court entered its August 2009 order, as the entire balance was due under the foreclosure judgment.  However, the debtors' right to cure under § 1322(c)(1) is not affected by state law which might otherwise require the debtors to redeem the property by paying the judgment in full.  Wescott, 309 B.R. at 311.  The forfeited funds had not been applied to the debt as of the petition date and the debtors' plan contemplates the de-acceleration of the mortgage, which justifies consideration of how the funds should be treated under the terms of the parties' original agreement.

owes a creditor multiple debts, a payment by the debtor should be applied to one or another of the debts as the debtor directs. Moser Paper Co. v. North Shore Publishing Co., 83 Wis. 2d 852, 857-58, 266 N.W.2d 411 (Wis. 1978). Where the debtor fails to direct application of the payment to a particular debt, the creditor may apply the payment as he chooses, and in the absence of direction by the parties, the court may make the application in accordance with equitable principles. Id. at 858. However, the rule that allows a debtor to allocate payment between two or more debts contemplates that the payments are "voluntary." Stevens v. United States, 49 F.3d 331, 334 (7th Cir. 1995).

As the Seventh Circuit noted, the idea of "voluntariness" is a continuum, or "an issue of more or less: more or less promptness in the payment . . . before the full coercive machinery of collection is brought to bear." Id. Thus, even if it were possible to construe this as a scenario in which the debtors owed the bank on "multiple debts" by segmenting the arrearage claim from the entire balance,[4] it would be impossible to find that the debtors are entitled to *direct* the application of the forfeited funds to the arrearages. They did not make the payment, and it was certainly not a "voluntary" payment on their behalf. But what they may not be able to direct by reference to the common law, they may nonetheless be entitled to achieve if it is what the parties contractually agreed.

---

[4] A common chapter 13 plan technique is to de-accelerate the mortgage debt and divide it into "pre-petition arrearage to be paid through the plan, and post-petition payments to be paid by the Debtor directly." Wescott, 309 B.R. at 310. While treated separately for plan purposes, as an economic reality they remain components of a single obligation.

5

Indeed, the resolution of this dispute hinges upon the proper interpretation of the mortgage itself. The mortgage is a contract and must be construed in accordance with its terms. The purpose of contractual construction is to "ascertain the intention of the parties to the contract as expressed by all of the language rather than to put a trick interpretation or twist upon one word." Langer v. Stegerwald Lumber Co., 259 Wis. 189, 192, 47 N.W.2d 734 (Wis. 1951). A reasonable meaning should be given to all provisions of an agreement so as not to render any part of the contract surplusage. Hastreiter v. Karau Bldg., Inc., 57 Wis. 2d 746, 748, 205 N.W.2d 162 (Wis. 1973). Contract construction is the art of determining the "sense, real meaning, or proper explanation of obscure or ambiguous terms" in an agreement. Hammel v. Ziegler Financing Corp., 113 Wis. 2d 73, 77-78, 334 N.W.2d 913 (Wis. Ct. App. 1983) (citing Black's Law Dictionary (5th ed. 1979)). A contract which on its face clearly discloses the parties' intent must be applied as written. In re Rude, 122 B.R. 533, 536 (Bankr. E.D. Wis. 1990). The primary goal in contract interpretation is to give effect to the parties' intent, as expressed in the contractual language. Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, 326 Wis. 2d 300, 311, 786 N.W.2d 15 (2010).

The parties acknowledge that the $27,250.00 was not a "payment" made directly by the debtors. However, Wis. Stat. § 846.17 dictates what happens when the prospective purchaser at a sheriff's sale does not pay the balance of the purchase price. The statute provides:

> In the event of the failure of such purchaser to pay any part of the purchase price remaining to be paid within 10 days after the confirmation of [the sheriff's] sale, the amount so deposited shall be

> forfeited and *paid to the parties* who would be entitled to the proceeds of such sale as ordered by the court. [Emphasis added]

Likewise, the August 6, 2009, state court order reflects that a check "made payable" to the bank in the amount of $27,250.00 was to be issued by the court clerk. That amount was to be "credited to the balance" owed by the debtors to the bank. The bank received an amount of money which was to be applied to the note. The debtors argue that the forfeited funds must be characterized as a "payment" and that under Paragraph 2 of the mortgage, "payments or proceeds" shall be applied as follows:

> [A]ll payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. *Such payments shall be applied to each Periodic Payment in the order in which it became due.* Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note. [Emphasis added].

To the debtors, the mortgage clearly contemplates that any payment the bank receives from any source (with certain specific exceptions) is to be applied to the "periodic payments" in the order in which they came due.

In response, the bank points to another provision of the same paragraph which provides exactly such an exception:

> Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

The bank argues that the forfeited funds should be regarded as "Miscellaneous Proceeds" under the mortgage. As such, they can be applied to the principal due under the note without altering the obligation to pay the "periodic payments." While

7

the mortgage does not specifically describe what constitutes a "payment," both "periodic payment" and "miscellaneous proceeds" are defined terms under the mortgage.  A periodic payment simply means "the regularly scheduled amount due for (i) principal and interest under the note" along with any escrow amounts due under section 3 of the mortgage.  The definition of "miscellaneous proceeds" is even more precise:

> "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

The challenge is to determine how to apply these various provisions to the forfeited funds.  Since the mortgage does not define "payment" in any specific fashion, it should be interpreted in a manner consistent with the common-law conception of the term.  As such, payment is simply the "discharge of an obligation in money or its equivalent." Chrysler Corp. v. Hanover Ins. Co., 350 F.2d 652, 656 (7th Cir. 1965); see also Smith v. Wisconsin Dep't of Taxation, 264 Wis. 389, 392, 59 N.W.2d 479 (Wis. 1953) ("payment constitutes giving something of value and its acceptance in satisfaction").  While Smith likewise notes that "a debt is not paid unless by mutual intention of the parties," the mortgage clearly reflects the parties' intention that amounts potentially paid by third parties - such as insurance proceeds or miscellaneous proceeds - would nonetheless work to discharge the debt, thus constituting "payment."  Clearly the delivery of the $27,250.00 check to

the bank had the effect of discharging a portion of the Holmdahls' obligation, so it also qualifies as a "payment" in the broader sense.

In assessing the bank's argument, it must be noted that the contractual language it references speaks to the application of three specific items to principal: "payments," "insurance proceeds," and "miscellaneous proceeds." It is easy enough to identify what the forfeited funds are *not*. First, they are not insurance proceeds. Second, they cannot be considered "miscellaneous proceeds" because the funds were not paid for damage to the property, as part of condemnation proceedings, or because of misrepresentations about the value or condition of the property. Finally, they are not a principal payment made with the intention of paying down the loan. Under paragraph 4 of the note, the debtors had a right to prepay the principal, but only on specific terms. Those terms include written notice to the bank that the payment was intended as a principal payment, and the debtors were contractually precluded from making a principal prepayment unless they were current on their monthly payments. As such, the clear language of the note and mortgage prevents the conclusion that the mortgage specifically directs the application of these funds to the principal balance.

In truth, the forfeited funds constitute an unusual "payment" on the loan which the parties likely never contemplated. However, based upon the language of the mortgage, there is no justification for treating the funds as anything other than "payments or proceeds" which should be "applied to each Periodic Payment in the order in which it became due." The primary goal in contract interpretation is to give effect to the parties' intent, as expressed by the contractual language. Md.

9

Arms, 326 Wis. 2d at 311.  Here, the intent seems clear.  Only specific payments would be applied to principal; all others would be handled in accordance with the broader contractual provision directing that payments be applied to periodic payments (of principal and interest) in the order they came due.

Even if the provisions could be regarded as ambiguous, as a rule of contract construction the loan documents must be construed against the party who "supplies the words," which in this case is the bank.  Id. at 319-20 (citing Restatement (Second) of Contracts § 206 (1979)); see also Jones v. Jenkins, 88 Wis. 2d 712, 723, 277 N.W.2d 815 (Wis. 1979) ("Ambiguous wording will be construed against the drafter provided the contract is also construed as a whole."); Converting/Biophile Labs., Inc. v. Ludlow Composites Corp., 2006 WI App 187, 296 Wis. 2d 273, 287, 722 N.W.2d 633 (2006) ("ambiguities in a contract provision are to be construed against the drafter").[5]  Any uncertainty about how the forfeited funds ought to be applied under the mortgage may fairly be construed in the debtors' favor, as the bank was more likely to be aware of the uncertainties that might arise and had the opportunity to draft the documents in such a way as to

---

[5] The rationale supporting this rule is found in the comments to the Restatement:

> Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party.  He is also more likely than the other party to have reason to know of uncertainties of meaning.  Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert.  In cases of doubt, therefore, so long as other factors are not decisive, there is substantial reason for preferring the meaning of the other party.  The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position. Restatement (Second) of Contracts § 206 cmt. a (1979).

protect its interests.  Not only is this outcome justified by the mortgage itself, but it is an equitable result which will allow the debtors a greater chance of successfully reorganizing their financial affairs, in keeping both with the intent of the bankruptcy code and Wisconsin law regarding redemption of residential real estate.  See Gisvold, 572 N.W.2d at 475 ("redemption is remedial in nature and should be liberally construed in favor of the debtor").

As previously indicated, the bank is not prejudiced by this interpretation.  If they succeed, the debtors will have cured all arrearages by the conclusion of their plan and will have maintained their current monthly payments.  The bank will have received all of the money it was entitled to receive under the terms of the de-accelerated mortgage, albeit in a somewhat unusual fashion.  Even if the debtors default on their plan, the bank will have received some payments (both current payments and arrearage payments) along with the forfeited funds, while retaining its mortgage lien and the ability to reschedule another sheriff's sale should the chapter 13 case end up dismissed.

Accordingly,

IT IS ORDERED that the $27,250.00 in funds received by AnchorBank as a result of the failed foreclosure sale shall be applied to the arrearages set forth in the bank's proof of claim.

Dated: November 3, 2010

BY THE COURT:

/s/ Thomas S. Utschig
_____
Hon. Thomas S. Utschig
U.S. Bankruptcy Judge
